We'll hear the next case, O'Neill v. Top Ships. and the individual Top Ships defendant. I want to address a few things that the plaintiff raised in her argument this morning. I'll start with where she finished. The capital could be used for any purpose. It was used to buy ships. That's in the public documents. There's no dispute about that. There were no ships at the beginning of the period. The company did have only a market cap of $20 million. It needed capital to continue and to try to survive, and it did just that. It's still around today. The allegation is the defendants made $47 million out of this, and the stock lost 100 percent of its value. So that's the allegation. If that's true, it's troubling. Well, I think the allegation is that the money was used to purchase ships from Pisteolus-related entities, and they somehow turned that into 100 percent profit. These ships are a pretty rare thing. There aren't a million tanker ships floating around in the ocean ready to be bought by anybody at any time. This is an extremely specialized industry. So Top Ships raised capital at, you know, on terms that were not great, obviously, because they were losing money and they had almost no market cap. And if you look at, and I'll obviously answer your question, Your Honor, but if you look at the ATSI case, that's a company that had a market cap of about a billion dollars at the beginning and went to zero and into bankruptcy. And this court noted, you know, there are times when a company can't raise money on favorable terms, so they have to raise money on terms that aren't great. And discounted convertible notes and discounted stock, that's not great terms, but that's money that comes into the company. The company then uses the money to operate itself and to buy ships. And if it bought ships from a related party, as the Court just noted or suggested by its question, so be it. That is not a securities fraud case. That is, as this Court well knows, a shareholder derivative lawsuit. There was an independent committee that approved these transactions. And if the shareholders didn't like it and they thought, oh, Pisteolis is lining his own pockets by buying ships from his family, then we're still there at the end of the period? I believe so, Your Honor, yes. Is there anything as to the value of the ships? In the record before us today, what is the value of the ships? I don't think that that is established. But, again, that is an issue that went before an independent committee of the Board, and it was approved. It was a related party transaction. It was all disclosed. This is supposed to be a disclosure case or an omissions case or a manipulation case, and it's none of those things. It's masquerading as such, but what it really is is a shareholder derivative suit or a holder claim or something like that. And when the plaintiff was asked the questions today, what is it that wasn't disclosed, the answer you heard was the certainty rather than the possibility of decimating the price of the stock. Actually, what the complaint says and what the argument was before the Court in the briefs was the certainty rather than the possibility that all of these stock issuances would be carried out and that everybody knew that on day one. That isn't even what happened, never mind that it was certain that it would happen. Let's remember that even though the answers today were about February of 2017 and agreements with Kalani, actually the class period is supposed to start in November of 2016 with a deal with an entity called York for $3 million worth of stock, of which only $2 million was sold. So even that transaction didn't consummate fully. The argument is that what was not disclosed is the intent to quickly turn around and, you know, they bought these shares at a discount under the agreement and then they quickly turned them around and sold them at a profit. And then with the additional amendments, more and more shares were put out there, the price went down, and then they were doing this reverse stock split. And that all along the intent was to engage in these transactions to siphon off money to the defendants. And so I think the allegation is what wasn't disclosed was their plan to engage in this scheme. So how do you respond to that? So I think the Wilson v. Merrill Lynch case, which is, again, from this circuit, answers that question pretty definitively because we have a disclosure of the material objective facts, which is what Wilson v. Merrill Lynch says. That was an auction rate securities case. But it's quite relevant here, of course. What they're saying is, and Your Honor is quite right as to what they say in the briefs, that's not what they said today, but that is what they said in the briefs, Your Honor, that it was the intent to consummate all these transactions that wasn't disclosed. The class period starts with a disclosure that the company may issue up to $206 or $203 million worth of stock. They didn't come anywhere close to that. But that was disclosed day one of the class period. So what is it that wasn't disclosed, that may means will or may means we really, really want to do this and we're going to do it as best we can? That's not a security fraud case. That's not nearly sufficient enough. And I think Judge Kogan got it exactly right. And all he was doing was following Wilson v. Merrill Lynch, which disposes very clearly that may doesn't mean maybe. May means we can. We are permitted to. We're not sure whether or not we're going to do it. It can't be read that way. And oh, by the way, every time we did this, it wasn't like we said this is the last time we're going to do it. Whenever we did it, we said, and we may do it again. Right in the disclosure. So there's nothing that's not disclosed. There's no material objective fact that's not disclosed. And that is the standard that this Court has set. All right. Thank you, Wilson, and your colleague. Thank you. Thank you, Your Honors. Good morning. May it please the Court. Peter White for Appellee Defendants Mark Bistracer, Murchinson, Kalani, and Zanthi. It strikes me that this case is unusual in at least two respects. One is that the entire claim here is based on the public filings. It's based on information that top ships put forward to the public. And the allegation in the complaint as to Kalani and Zanthi is that they did exactly what they said they were going to do. They bought shares from the company, and they sold them exactly in the manner in which they were entitled to do under the agreements that were disclosed to the market. There's no allegation that Kalani or Zanthi did otherwise than that. There's no misrepresentation that the plaintiff's claim was made. And without that, of course, there can be no claim for securities fraud. There's no allegation, of course, that Kalani or Zanthi had anything to do with the internal corporate actions of top ships or the related party transactions that they mentioned or the decisions about reverse splits. There's no allegation of that. But that wouldn't matter because the fact of the matter is everything that they have here is based on the public filings. The other thing that's really unusual about this case is, as counsel noted, the class period begins the day that top ships announces that it plans to try to inject another $200 million of capital into the company by issuing new shares of stock. So from day one, the market is on notice that that is their intention. Ultimately, they did far short of that. But that's their intention. So every plaintiff is somebody who bought with knowledge that this is a company that plans to engage in an inherently dilutive transaction. I mean, obviously, a market cap of $20 million, you're looking at at least 90 percent dilution, assuming the stock price stays the same. Of course, in any market, an infusion of a lot more sales is going to depress the stock price as well. So every plaintiff bought knowing that there was a dilutive transaction that was coming and that there was that was going to have a diminishing effect on the stock price. And all of that was disclosed in the initial documents, that it was going to be dilutive necessarily and that it was very likely going to drive the stock price down. The fact of the matter is that there really is nothing that plaintiffs complain about here that was not disclosed before the transactions that they engaged in occurred. And there cannot be market manipulation without a misrepresentation made to the public. The fact of the matter is that the conduct, and there is no well-plaid allegation that there was knowledge of how this was always going to proceed at the beginning. There isn't because there couldn't have been. The fact of the matter is what actually happened was much more consistent with a party who didn't know how this whole thing was going to go. There were small transactions that grew over time and ultimately didn't get to the $200 million barrier, but they did get past $40 million. That is inconsistent with the idea that there was a plan from the beginning. I see my time has expired. So unless there are any questions, we'd ask you to affirm the judgment of the district court. Thank you. We'll hear the rebuttal. With all due respect, it's misleading to get up here and say that that money was used to purchase vessels. The complaint is replete with allegations that Pisteolis-related companies received bonuses and compensation, which was the bulk of what that money was used for. Central Mare, the company that he owned, received a $1.5 million bonus directly to Pisteolis. But that's not really market manipulation, right? That's really that you're saying that they violated the business judgment rule, that they poorly managed their company once they raised capital. That's a different claim, isn't it? Well, this all goes to the manipulative acts, that they were never using this money in the first place for corporate business purposes, that they weren't using it to keep the company afloat and buy and purchase vessels. They were using it to pay off Pisteolis and bonuses and compensation, shown by the fact that they went into even more debt at the end of the class period. And also I want to say that defendant's argument belies the case law. There are loads of cases, and I can just list them. They're all cited in the brief, that basically say that even legitimate transactions that are disclosed constitute market manipulation. And that's, of course, Charette, but also Set Capital, SEC v. Fiore, Dodonia, Grubel. Grubel specifically said market manipulation is upheld where the transactions were disclosed because they didn't reveal the full parameters of the fraud. The only case — Excuse me. Can I just — how do you get around Wilson? Wilson was a different situation because in Wilson, the knowledge was known the SEC actually had already been honest and issued an order saying that the defendants were committing fraud. And that happened — Let me just focus on this part of the Wilson holding, and this is on the use of the word may. And I think in Wilson, the disclosure was, you know, Merrill Lynch may routinely do a certain something. And as I recall, the plaintiff said, well, gosh, they didn't. In reality, it wasn't that they were thinking about doing it periodically. It's that they were going to definitely do it. And I thought this Court said may routinely, those words, are perfectly consistent with an intent to do it every single time. So I guess I don't understand how that's different from your allegation that they said, well, we might do it, and you're saying, well, they were going to definitely do it. Well, that's exactly what this Court said was fine for Merrill Lynch in Wilson, isn't it? So how is that different? Well, in Wilson, the Court also held that the theory on appeal didn't coincide with the allegations in the complaint, and that manipulative conduct had been known in the market because it was the subject of an SEC order. So the disclosures in that case came after this SEC order stating what the defendants were doing wrong. But in this case, if you look at the case well cited, even in one of the cases, Creed, who is also a party who engaged in the same similar acts in this case, it was the Tanzanian case. Judge Schofield said, while large-volume sales are not inherently manipulative and they were disclosed, when pled with the purpose to drive down the price of the So Wilson, the only case defendant in sight, is countered by 10 or 15 cases where the Second Circuit finds that when you allege manipulative acts with an intent to drive down the price of the stock, that's sufficient. And that's based on these factual inferences in this case that the Court ignored. And the voting where the Court said the shareholder the Court a large part of why the Court found that the transactions were disclosed here is because the Court said the shareholders voted for the reverse actions and they can't now be made to complain about what they voted for. The shareholders didn't vote for these transactions. Pisteolis pushed through these transactions with his control of the vote, even though he only had 26 shares at the end of the class period. Thank you. Well-reserved decision. Thank you.